**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

ISAAC RAMOS,
            *Defendant-Appellant.*

No. 09-50059

D.C. No.
3:07-cr-03402-
IEG-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted
December 8, 2009—Pasadena, California

Filed September 24, 2010

Before: Stephen Reinhardt, Stephen S. Trott and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

16253

---

## COUNSEL

Joan Kerry Bader, San Diego, California, for the defendant-appellant.

Karen P. Hewitt, United States Attorney, Bruce R. Castetter, Assistant United States Attorney, and Eric J. Beste, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

---

## OPINION

WARDLAW, Circuit Judge:

Isaac Ramos appeals the district court's denial of his motion to dismiss the indictment for unlawful reentry after a prior deportation in violation of 8 U.S.C. § 1326, which he collaterally attacked in his motion to dismiss. Ramos argues that the Department of Homeland Security ("DHS") and the Immigration Judge ("IJ") violated his due process rights and the applicable regulation when they removed him through the stipulated removal program. 8 U.S.C. § 1229a(d), 8 C.F.R.

§ 1003.25(b). He argues that the stipulated removal order entered by an IJ at the Eloy Detention Center in Eloy, Arizona, is invalid because he was not accorded his Fifth Amendment due process rights and the deportation officers and IJ failed to comply with the procedures set forth in 8 C.F.R. § 1003.25. Although we agree that the stipulated removal proceedings denied Ramos due process of law and violated the applicable regulation, we conclude that he suffered no prejudice as a result, and affirm.[1]

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Ramos is a citizen and native of Mexico. He first entered the United States without inspection approximately twenty years ago. He is married to a legal permanent resident, and has two U.S. citizen children and one U.S. citizen stepchild. Ramos was apprehended after crossing the United States-Mexico border near Otay Mesa, California on November 21, 2007. A year and six months earlier, on May 11, 2006, Ramos had been ordered removed under the "stipulated removal" provision of 8 U.S.C. § 1229a(d).

## A.   Stipulated Removal Process

The stipulated removal provision allows an IJ to enter an "order of removal stipulated to by the alien (or the alien's representative) and the [Immigration and Naturalization] Service."[2] 8 U.S.C. § 1229a(d). An IJ's ability to enter stipulated removal orders "facilitates judicial efficiency in uncontested

---

[1]The remaining issues presented in Ramos's appeal are addressed in a memorandum disposition filed concurrently with this opinion.

[2]On March 1, 2003, the functions of the former Immigration and Naturalization Service ("INS") were transferred from the Department of Justice to three agencies (the U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services) in the newly formed Department of Homeland Security ("DHS"). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

cases," and serves to "alleviate overcrowded federal, state, and local detention facilities." Stipulated Requests for Deportation or Exclusion Orders, 59 Fed. Reg. 24,976 (May 13, 1994).

The Department of Justice ("DOJ") first promulgated a regulation implementing stipulated removal in 1995. 8 C.F.R. § 3.25. The regulation codified an IJ's discretion to enter a stipulated removal order without a hearing and in the absence of the alien, but, out of due process concerns, limited the availability of such orders only to aliens represented by counsel at the time the stipulation was entered. *See* Stipulated Requests for Deportation or Exclusion Orders, 60 Fed. Reg. 26,351-52 (May 17, 1995). The regulation provided further procedural safeguards for aliens stipulating to their removal by mandating that the IJ determine that the "represented respondent/applicant voluntarily, knowingly, and intelligently entered into a stipulated request for an order of deportation or exclusion." 8 C.F.R. § 3.25 (1995); *see also* Stipulated Requests for Deportation or Exclusion Orders, 59 Fed. Reg. at 24,976. As the DOJ noted, "the words 'voluntarily, knowingly and intelligently' . . . ensure maximum protection for aliens entering into stipulations," and protect those who cannot "fully understand the ramifications of a stipulation" due to limited English language skills. 60 Fed. Reg. at 26,351-52.

**[1]** In 1997, the DOJ amended the language of the regulation to its current form, which governs Ramos's removal proceedings.[3] *See* Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10,312, 10,321-22 (Mar. 6, 1997). Like the former version of the regulation, 8 C.F.R. § 1003.25 provides an IJ with discretion to "enter an order of deportation, exclusion or removal stipulated to by the alien (or the alien's representa-

---

[3]The current version of the regulation, 8 C.F.R. § 1003.25, was previously codified at 8 C.F.R. § 3.25(b) (1997), but was redesignated at its present location in 2003, without any alterations to the regulatory language. *See* 68 Fed. Reg. 9830 (Feb. 28, 2003).

tive) and the Service." *Id.* The amended regulation, however, permits an IJ to enter stipulated orders of removal for aliens without legal representation, and requires that the stipulation include:

> (1) An admission that all factual allegations contained in the charging document are true and correct as written;
>
> (2) A concession of deportability or inadmissability as charged;
>
> (3) A statement that the alien makes no application for relief under the [Immigration and Nationality] Act;
>
> (4) A designation of a country for deportation or removal under section 241(b)(2)(A)(i) of the Act;
>
> (5) A concession to the introduction of the written stipulation of the alien as an exhibit to the Record of Proceeding;
>
> (6) A statement that the alien understands the consequences of the stipulated request and that the alien enters the request voluntarily, knowingly, and intelligently;
>
> (7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings; and
>
> (8) A waiver of appeal of the written order of deportation or removal.

8 C.F.R. § 1003.25(b).

   **[2]** The amended regulation provides additional procedural safeguards for unrepresented aliens in stipulated removal pro-

ceedings by requiring that the IJ "determine that the alien's waiver is voluntary, knowing, and intelligent." *Id.* As the DOJ noted, this requirement

> safeguards against an imprudent waiver of a formal adjudication on the part of an unrepresented alien . . . . If an immigration judge is confronted with a stipulated request raising due process concerns, he or she may examine that request in the context of a hearing.

Inspection and Expedited Removal of Aliens, 62 Fed. Reg. at 10,322.

## B. Ramos's Stipulated Removal Proceedings

On May 9, 2006, DHS issued a warrant of arrest and a Notice to Appear ("NTA") on Ramos in Bakersfield, California. The NTA charged Ramos with removability for commission of a crime involving moral turpitude in violation of 8 U.S.C. § 1182(a)(2)(A)(i)(I); commission of a controlled substance violation in violation of 8 U.S.C. § 1182(a)(2)(A)(i)(II); and presence in the United States without admission or parole in violation of 8 U.S.C. § 1182(a)(6)(A)(I). The NTA also charged that Ramos had a prior conviction for possession of methamphetamine, in violation of California Health and Safety Code § 11377(a); a conviction for inflicting corporal injury, in violation of California Penal Code § 273.5(a); and a conviction for false imprisonment in violation of California Penal Code § 236.

On the same day, DHS transferred Ramos from Bakersfield to the Eloy Detention Center ("Eloy") in Eloy, Arizona. The Eloy Detention Center houses and serves as a transfer point for up to 1,500 alien detainees per day. At Eloy, DHS employs deportation officers who are responsible for assisting DHS's Office of Chief Counsel in obtaining evidence, conducting interviews with detainees, performing criminal his-

tory checks, and escorting detainees who have been ordered removed back to their country of origin.

On May 11, 2006, deportation officers presented Ramos with a form entitled "Stipulated Request for Removal Order and Waiver of Hearing" ("Stipulated Removal form" or "form"). The Stipulated Removal form distributed by officers at Eloy contains a series of statements and admissions, written first in English, and below that, translated into Spanish. The form sets forth several stipulations on the part of the alien, some of which are specified in 8 C.F.R. § 1003.25, and some of which are not required by regulation. For example, in Paragraph 4 the alien stipulates:

> I have been advised of my right to be represented by an attorney of my choice, at my own expense, during these proceedings. I waive this right. I will represent myself in these proceedings.

Also not required by the regulation is the stipulation in Paragraph 5, that "I will be giving up the following legal rights that I would have in a hearing before an Immigration Judge: a) the right to question witnesses; b) the right to offer and to object to evidence; c) the right to require the government to prove my removability."

In Paragraph 8, the alien waives any present eligibility for relief from deportation:

> I knowingly and intelligently waive my right to apply for any relief or protection from removal for which I may be eligible under the Immigration and Nationality Act or any other provision of law. Such relief and protection may include voluntary departure, adjustment of status, suspension of deportation or cancellation of removal, registry, naturalization, political asylum, withholding of removal, and protection under the Convention Against Torture.

Under Paragraph 13, the alien waives "appeal of the written order of removal."

By signing the form, the detained alien "admit[s] [to] all of the factual allegations contained in the NTA," concedes deportability or inadmissibility as charged on the NTA, and provides that he or she will accept a written order for removal as a final disposition. The form also specifies that the entire document has been "read to me in a language that I understand" and that "I fully understand its consequences. I submit this request for removal voluntarily, knowingly, and intelligently." *See also* 8 C.F.R. §§ 1003.25(b)(1), (2), (6), (7).

The district court held an evidentiary hearing on Ramos's motion to dismiss. Deportation Officer Christina Olson verified that she had met individually with Ramos on May 11, 2006 after he attended the group presentation and witnessed him sign the Stipulated Removal form. By signing the form, Ramos, who is not fluent in English and speaks Spanish, admitted the allegations included in a second NTA, which charged him with removability for presence in the United States without admission or parole under 8 U.S.C. § 1182(a)(6)(A)(i).

Officer Olson testified that immigration enforcement agents review detainees' Alien Registration Files ("A-file") upon their arrival to select detainees for participation in the stipulated removal program instead of scheduling an appearance before the IJ. A detainee is selected for participation in stipulated removal if he or she 1) is a citizen of Mexico, 2) has been in the United States for less than ten years, and 3) has been charged with illegal entry into the United States. Immigration enforcement agents do not read the A-file further to determine whether detainees selected for the stipulated removal program are eligible for any relief from removal.

After detainees are selected for participation in the stipulated removal program, deportation officers typically prepare

an NTA and a Stipulated Removal form for each individual. Deportation officers then gather detainees selected for the program for a group presentation. There, an immigration enforcement agent explains in Spanish that a detainee has two options: first, to accept stipulated removal, or second, to appear before an IJ, where the detainee may ask to remain legally in the United States or seek voluntary departure. The agent also advises the group that under the stipulated removal program, a detainee can be removed that very day; whereas it could take anywhere from two to three weeks or longer to appear before an IJ if the detainee chooses not to sign the form. The agent then reads the text of the Stipulated Removal form aloud in Spanish, and concludes the presentation. Next, DHS deportation officers meet individually with each detainee to determine whether he or she wants to sign the Stipulated Removal form. Deportation officers do not review the detainee's A-file at any time before or during the individual meeting. No transcriber, interpreter, or attorney is present during the detainee's individual meeting with the deportation officer.

Asked to describe her individual meeting with Ramos, Officer Olson testified that at the outset, she asks a detainee if he or she speaks English; if so, she continues in English, and if not, she conducts the meeting in Spanish. Olson, however, is not fluent in Spanish, and her Spanish language education was limited to "several classes" during her training with DHS's Bureau of Immigration and Customs Enforcement ("ICE").

Officer Olson also testified that during the individual meeting, a deportation officer typically verifies the identity of the detainee and information typed on the biographical information sheet, and serves the NTA on the detainee. The deportation officer then determines whether the detainee wants to sign the Stipulated Removal form by asking "whether or not they want to have a court hearing or whether they want to be deported that day." When encountering Spanish-speaking

detainees, Olson asks in the Spanish language a question she understands translates in English to "do you want to fight your case or want to sign?" Officer Olson translated that phrase into Spanish during the hearing. However, the Spanish language court interpreter had difficulty comprehending the question, advising the court that the statement was "nonsensical in part. . . I wouldn't know how to translate certain parts of that." She also faulted Officer Olson's Spanish pronunciation.

If Officer Olson feels that a detainee does not understand her, she will try to clarify any questions, will ask another agent to take over the meeting, or will not proceed with the stipulated removal. Otherwise, she has the detainee sign the Stipulated Removal form. Once signed, it is forwarded to the DHS's Office of Chief Counsel for approval. After approval, DHS counsel submits the detainee's Stipulated Removal form. DHS also submits a form entitled "Concurrence to Stipulated Request for Removal Order and Waiver of Hearing," which specifies that the government "concurs with the Respondent's request pursuant to 8 C.F.R. § 1003.25(b) for the Immigration Judge to issue a stipulated removal order without holding a hearing." At that time, the IJ determines whether to issue a final order of removal based on the form and any other materials submitted by DHS. If the IJ issues an order of removal, deportation officers typically remove the detainee from the United States on the same day.

On the day of Ramos's interview with Officer Olson, the IJ issued a decision finding Ramos removable pursuant to INA § 212(a)(6)(A)(i), and ordering him removed. The IJ found that

> In his stipulation, respondent states that he understands the consequences of his request and that he has entered his request voluntarily, knowingly, and intelligently. The Court finds the alien's waiver to be voluntary, knowing, and intelligent. . . . The court

> therefore, finds upon review of the charging document and the written stipulation that he is removable based upon clear and convincing evidence in the form of his own admissions. Respondent makes no application for relief from removal but instead requests an order removing him from this country as soon as possible.

DHS officers removed Ramos to Mexico by the end of the day.

## C. Ramos's Collateral Attack on His Stipulated Removal

Following his November 2007 arrest, Ramos was indicted by a grand jury for violation of 8 U.S.C. § 1326. Ramos pled not guilty, and filed the motion to dismiss the indictment now on appeal. Denying this motion, the district court first concluded that Ramos's stipulated removal order was valid under *United States v. Galicia-Gonzales*, 997 F.2d 602 (9th Cir. 1993), placing the burden of proof to show an invalid waiver upon Ramos. Although the district court found "some flaws" in the 2006 stipulated removal proceedings, it concluded that Ramos failed to meet his burden of proof because Officer Olson would have not signed the Stipulated Removal form if she had any doubts as to Ramos's understanding of the rights he was relinquishing. Alternatively, the court found no showing of prejudice because Ramos was not, as he claimed, eligible for relief under the Immigration and Nationality Act ("INA") § 212(h), 8 U.S.C. § 1182(h). Following a bench trial, the district court found Ramos guilty of violating 8 U.S.C. § 1326.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review a final judgment of the district court pursuant to 28 U.S.C. § 1291. In *United States v. Lopez-Vasquez*, 1 F.3d 751 (9th Cir. 1993), we held that "[a] claim that a defect in a prior deportation order precludes reli-

ance on the deportation in a prosecution for violation of 8 U.S.C. § 1326 presents 'mixed questions of law and fact requiring us to exercise judgment about legal principles.' Accordingly, we review [the] claims de novo." *Id.* at 752 (quoting *United States v. Proa-Tovar*, 975 F.2d 592, 594 (9th Cir. 1992)). The petitioner in *Lopez-Vasquez* brought a collateral challenge to his deportation order based on the invalidity of a mass silent waiver of the right to appeal deportation. Ramos brings a similar challenge to a defect in his waiver; thus, the *Lopez-Vasquez* de novo standard of review governs. We review the district court's findings of fact for clear error. *United States v. Lazarevich*, 147 F.3d 1061, 1065 (9th Cir. 1998).

## III.   DISCUSSION

### A.   Validity of Waiver of Appeal

[3] We must first determine whether Ramos validly waived his right to appeal by signing the Stipulated Removal form, which would preclude this collateral challenge to his removal. "[A]n alien cannot collaterally attack an underlying deportation order if he validly waived the right to appeal that order." *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000). However, under 8 U.S.C. § 1326(d), a defendant may collaterally attack the underlying removal order by showing first, exhaustion of "any administrative remedies that may have been available to seek relief against the order;" second, that "the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review;" and third, that "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). An underlying removal order is fundamentally unfair if an alien's "due process rights were violated by defects in the underlying deportation proceeding," and if "he suffered prejudice as a result of the defects." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) (internal quotation marks omitted).

A valid waiver of the right to appeal "must be both 'considered and intelligent.' " *Arrieta*, 224 F.3d at 1079 (quoting *United States v. Estrada-Torres*, 179 F.3d 776, 780-81 (9th Cir. 1999)). The government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings. *Lopez-Vasquez*, 1 F.3d at 753. We "indulge every reasonable presumption against waiver," and do "not presume acquiescence in the loss of fundamental rights." *Id.* (internal quotation marks omitted). Moreover, "the due process inquiry focuses on whether [the defendant] *personally* made a 'considered and intelligent' waiver of his appeal." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1049 n.8 (9th Cir. 2004) (emphasis in original). The district court thus erred in shifting the burden of proving valid waiver of the right to appeal to Ramos.

We conclude that Ramos's waiver of his right to appeal was invalid for several independent reasons. As a threshold matter, however, we note that the district court erred in concluding that the validity of Ramos's stipulated removal order was controlled by our decision in *Galicia-Gonzalez*, 997 F.2d 602. In *Galicia-Gonzalez*, we held that an alien petitioner validly conceded deportability and waived his rights to a hearing and appeal through a stipulated agreement with the government. However, unlike the petitioner in *Galicia-Gonzalez*, who had received a full explanation of a stipulated removal agreement from his counsel, and who had entered into the stipulation through counsel, Ramos lacked the benefit of legal representation.

**[4]** Ramos's waiver of appeal and of the due process rights specified in the Stipulated Removal form was not "considered or intelligent" because he did not receive a competent Spanish language translation of his right to appeal when he signed the form. "It is long-settled that a competent translation is fundamental to a full and fair hearing. If an alien does not speak English, deportation proceedings must be translated into a

language the alien understands." *Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000).

We cannot conclude that waiver of rights, including the right to appeal, was "considered or intelligent" without evidence that a detainee was "able to understand the questions posed to him" when put to the choice of foregoing all rights or remaining in detention until he could appear before an IJ. *Id.* The government argues that Ramos's waiver was "considered and intelligent" because Ramos failed to give any indication to the deportation officer that he did not understand or appreciate what he was signing. However, a deportation officer's "feeling" that a detainee understood her broken attempts to speak Spanish is insufficient to meet the government's burden. *See Lopez-Vasquez*, 1 F.3d at 754. Without the benefit of "the services of an interpreter . . . [whose] capacity should be unquestioned," *Perez-Lastor*, 208 F.3d at 778, Ramos signed away his right to appeal, to appear before an IJ, and to be represented by counsel in an individual meeting with a deportation officer who testified that she is not fluent in Spanish. Given these circumstances, the government failed to meet its burden of proving that Ramos's waiver was not "considered and intelligent."

**[5]** Moreover, we cannot conclude that Ramos's waiver was "considered and intelligent" because the government has not established by "clear and convincing evidence" that he received adequate advisement of the consequences of his waiver of appeal. *Pallares-Galan*, 359 F.3d at 1097. Here, an uncounseled Spanish-speaking alien detainee did not have the opportunity to appear before an IJ and was only advised of his right to appeal by an immigration enforcement agent or deportation officer. Even where an alien has the opportunity for his case to be reviewed "by an individual who is intimately familiar with immigration laws—as IJs no doubt are," *Moran-Enriquez v. INS*, 884 F.2d 420, 423 (9th Cir. 1989), we have found an invalid waiver. An IJ's failure to explore waiver adequately with the petitioner "preclude[s] a purported

waiver from being 'considered and intelligent.' " *Pallares-Galan*, 359 F.3d at 1097. The "requirement that the IJ inform an alien of his or her ability to apply for relief from removal is mandatory, and failure to so inform the alien of his or her eligibility for relief from removal is a denial of due process that invalidates the underlying deportation proceeding." *Ubaldo-Figueroa*, 364 F.3d at 1050 (internal quotation marks omitted); *see also United States v. Muro-Inclan*, 249 F.3d 1180, 1182 (9th Cir. 2001) (concluding same); *Arrieta*, 224 F.3d at 1079 (same); *cf. United States v. Ahumada-Aguilar*, 295 F.3d 943, 950 (9th Cir. 2002) (concluding that waiver is not "considered and intelligent" where an IJ provides an erroneous interpretation of potential relief from deportation).

**[6]** Here, Ramos was not represented and never had the benefit of appearing before an IJ, who, we presume, would have "adequately conveyed both the alien's appeal options and the finality associated with waiving appeal." *In re Rodriguez-Diaz*, 22 I. & N. Dec. 1320, 1323 (BIA 2000); *see also* 8 U.S.C. § 1229a(c)(5).[4] Nor at any time in the stipulated removal proceedings did Ramos receive the benefit of a review of his potential eligibility for relief. Ramos thus lacked the benefit of counsel or a hearing before the IJ in navigating the "labyrinth" of our immigration laws, which we have "termed 'second only to the Internal Revenue Code in complexity.' " *Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1988) (internal quotation marks omitted). Because Ramos failed to receive the benefit of procedural safeguards necessary to ensure a valid waiver of the right to appeal, we conclude that his waiver of appeal was invalid. *See Ubaldo-Figueroa*, 364 F.3d at 1049 ("An alien can not make a valid

---

[4]We therefore find unpersuasive the government's argument that Ramos's waiver of appeal is "constitutionally indistinguishable" from that in *United States v. Estrada-Torres*, 179 F.3d 776, 781 (9th Cir. 1999), *overruled on other grounds by United States v. Rivera-Sanchez*, 247 F.3d 905 (9th Cir. 2001) (en banc). In that case, an IJ discussed the right to appeal the deportation order with the defendant and specifically and individually asked whether he wanted to appeal his deportation order.

waiver of his right to appeal a removal order if an IJ does not expressly and personally inform the alien that he has the right to appeal."). Accordingly, we hold that Ramos's waiver of his right to appeal the underlying removal order was procedurally defective and deprived him of the opportunity for meaningful judicial review. *See* 8 U.S.C. §§ 1326(d)(1)-(2).

## B.  Validity of Waiver of Due Process Right to Counsel

Ramos also argues that his stipulated removal proceedings deprived him of his right to counsel in violation of due process. We agree.

**[7]** "Although there is no Sixth Amendment right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the Fifth Amendment guarantee of due process that adhere to individuals that are the subject of removal proceedings." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004). " 'Although IJs may not be required to undertake Herculean efforts to afford the right to counsel, at a minimum they must [(1)] inquire whether the petitioner wishes counsel, [(2)] determine a reasonable period for obtaining counsel, and [(3)] assess whether any waiver of counsel is knowing and voluntary.' " *Ram v. Mukasey*, 529 F.3d 1238, 1241-42 (9th Cir. 2008) (alterations in original) (quoting *Biwot v. Gonzales*, 403 F.3d 1094, 1100 (9th Cir. 2005)).

**[8]** Neither 8 U.S.C. § 1229a(d) nor 8 C.F.R. § 1003.25 requires a waiver of the Fifth Amendment right to be represented by counsel in stipulated removal proceedings. The Stipulated Removal form employed by DHS officials at Eloy, however, does effect a waiver of the right to counsel. The government argues that Ramos's waiver of the right to counsel was valid because he signed a written waiver later reviewed by the IJ, unlike the petitioners in *Ram* and *Tawadrus*. In *Ram*, we concluded that an alien did not validly waive his right to counsel because, at the hearing, the IJ failed

to adequately assess whether waiver by Ram was knowing and voluntary. *Ram*, 528 F.3d at 1241-42. In *Tawadrus*, we concluded that the waiver of the right to counsel was invalid because the IJ failed to inform Tawadrus of the right to counsel when his original attorney withdrew. *Tawadrus*, 364 F.3d at 1103. We held that the IJ's failure even to inquire as to whether Tawadrus wanted an attorney present was an abuse of discretion and a violation of due process. *Id.* at 1105. The government's attempt to distinguish *Ram* and *Tawadrus* on the basis that in those cases, the waiver was verbal, and, here, Ramos signed the waiver misses the point. The key question is whether the waiver is "knowing and voluntary," not whether it is verbal or written. Moreover, alien petitioners in both *Ram* and *Tawadrus* appeared before an IJ, who was both charged with and able to assess whether the waiver was knowing and voluntary. Ramos did not receive the benefit of appearing before an IJ, and " 'at no time did [an IJ] direct any questions to [Ramos] concerning the implications of' proceeding without an attorney." *Ram*, 529 F.3d at 1242 (quoting *Tawadrus*, 364 F.3d at 1104) (first alteration in original). Furthermore, Ramos did not receive a competent explanation of his rights in a language he could understand. *See Perez-Lastor*, 208 F.3d at 778. Given these circumstances, Ramos's signature on the Stipulated Removal form does not establish that his waiver was knowing and voluntary. Accordingly, we conclude that Ramos's waiver of counsel was invalid and a violation of his due process right to counsel.

## C. Regulatory Violation

**[9]** We also conclude that the IJ violated 8 C.F.R. § 1003.25(b) by failing to determine whether his waiver was "voluntary, knowing, and intelligent," as required by the regulation, and that his underlying removal is thus invalid. *Id.*

"It is a well-known maxim that agencies must comply with their own regulations." *Ramon-Sepulveda v. INS*, 743 F.2d 1307, 1310 (9th Cir. 1984) (internal quotation marks omitted).

When determining whether an agency's violation of a regula-
tion invalidates an underlying deportation, we must first
determine whether the regulation itself "serve[s] a purpose of
benefit to the alien." *United States v. Rangel-Gonzales*, 617
F.2d 529, 530 (9th Cir. 1980). If the regulation serves a pur-
pose beneficial to the alien, "the violation invalidates the
deportation 'only if the violation prejudiced the interests of
the alien which were protected by the regulation.' " *Id.* (quot-
ing *United States v. Calderon-Medina*, 591 F.2d 529, 531 (9th
Cir. 1979)).

8 C.F.R. § 1003.25(b) clearly serves to benefit aliens
ordered deported, excluded, or removed pursuant to the regu-
lation. As the agency's own regulatory commentary states, the
requirement that an IJ determine that an alien's waiver of his
right to a hearing before an IJ was "voluntary, knowing, and
intelligent" "safeguards against an imprudent waiver of a for-
mal adjudication on the part of an unrepresented alien. . . . If
an immigration judge is confronted with a stipulated request
raising due process concerns, he or she may examine that
request in the context of a hearing." Inspection and Expedited
Removal of Aliens; Detention and Removal of Aliens, 62
Fed. Reg. at 10,312.

The government argues that the Stipulated Removal form,
which stated "I submit this request for removal voluntarily,
knowingly, and intelligently," was a sufficient basis from
which the IJ could conclude that Ramos validly waived his
rights. However, the circumstances of Ramos's stipulated
removal proceedings at Eloy, in which he was unrepresented
by counsel, show otherwise. Without any independent inquiry
of the petitioner, and depending solely on information pro-
vided by DHS, the IJ concluded that Ramos had "voluntarily,
knowingly, and intelligently" waived his due process rights.
As we have noted, "shortcuts frequently turn out to be mis-
takes." *Cano-Merida v. INS*, 311 F.3d 960, 965 (9th Cir.
2002). Moreover, Ramos's waiver of rights, including his
right to a hearing, was not knowing and intelligent. The gov-

ernment failed to give Ramos a competent explanation of the Stipulated Removal form in a language he could understand. *See Perez-Lastor*, 208 F.3d at 778. The government also failed to advise Ramos adequately as to his rights to appeal and to counsel and never advised him as to any potential ground for relief from deportation. We therefore conclude that DHS and the IJ failed to comply with the requirements of 8 C.F.R. § 1003.25(b).

## D. Prejudice

**[10]** To prevail on a motion to dismiss an indictment on the basis of an alleged due process defect in an underlying deportation proceeding, a defendant must not only establish that the defects in the deportation proceeding violated his due process rights, but also show that he suffered prejudice as a result of those defects. *Ubaldo-Figueroa*, 364 F.3d at 1048. A defendant need not conclusively demonstrate that he or she would have received relief to show prejudice, but must show only that there were "plausible grounds for relief." *United States v. Gonzales-Valerio*, 342 F.3d 1051, 1054 (9th Cir. 2003). If the defendant is "barred from receiving relief, his claim is not 'plausible.' " *Id.* at 1056. A defendant must also show prejudice to invalidate the underlying deportation where he or she alleges the agency's regulatory violation. *Rangel-Gonzales*, 617 F.2d at 530.

**[11]** Although we conclude that DHS violated Ramos's right to due process in the underlying deportation, and that the agency violated its own regulation in doing so, we conclude that he suffered no prejudice as a result. To establish prejudice, Ramos contends only that he would have qualified for relief under INA § 212(h), 8 U.S.C. § 1182(h), and presents no other plausible grounds for relief. However, Ramos is statutorily ineligible for this relief. INA § 212(h) does not provide relief for aliens removed for illegal presence in the United States without admission or parole in violation of 8 U.S.C. § 1182(a)(6)(A)(i), the ground upon which Ramos was

ultimately removed. Whether Ramos would be eligible for a waiver of removal on the ground of his controlled substance violation is therefore immaterial. Accordingly, we conclude that Ramos was not prejudiced as a result of the due process or regulatory violations in the underlying stipulated removal proceedings, and affirm the district court's denial of the motion to dismiss the indictment on that basis.

## IV.   CONCLUSION

We conclude that Ramos's waiver of the right to appeal pursuant to the stipulated removal proceedings was not "considered and intelligent" and thus violated his right to due process and rendering the waiver invalid. The government failed to demonstrate that Ramos's waiver of his right to counsel was "knowing and voluntary," therefore violating his due process right to counsel. Finally, we conclude that the IJ violated the plain requirements of 8 C.F.R. § 1003.25 by failing to determine whether Ramos, who was unrepresented by counsel, had "voluntarily, knowingly, and intelligently" entered into the stipulation of removal. Because Ramos failed to show prejudice resulting from these regulatory and due process violations, however, we affirm the district court's denial of the motion to dismiss the indictment.

**AFFIRMED.**